**MILBERG PLLC**
William J. Edelman (SBN 285177)
wedelman@milberg.com
Heather M. Lopez (SBN 354022)
hlopez@milberg.com
280 South Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: 866.252.0878

Albert J. Plawinski*
**PLAWINSKI, PLLC**
2101 Pearl St.
Boulder, CO 80302
albert@plawinski.law

**Pro Hac Vice Admission forthcoming*

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

**MICHELLE ANN MAMMINI** on behalf of herself and all others similarly situated,

*Plaintiff,*

v.

**HAPPEN, INC. (f/k/a LENDINGCLUB CORPORATION), MICROSOFT CORPORATION, and THE TRADE DESK, INC.**

*Defendants.*

Case No. 3:26-cv-8979

**CLASS ACTION COMPLAINT FOR:**

1. **VIOLATIONS OF CAL. PENAL CODE §§ 631-632, *et seq.*;**
2. **VIOLATIONS OF CAL. PENAL CODE § 502;**
3. **VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2510, *et seq.*; and**
4. **INTRUSION UPON SECLUSION**
5. **NEGLIGENCE**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff Michelle Ann Mammini ("Plaintiff") brings this class action complaint on behalf of herself and all others similarly situated against Defendants, for collecting and aiding and abetting the collection of consumers' sensitive financial information. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to herself and her own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. LendingClub has described itself as the only "full-spectrum fintech marketplace bank"[1] and claims to be "rewriting the rules of traditional banking." LendingClub offers personal loans to cover, *inter alia,* major life expenses, home improvement projects, debt consolidation, and even provides loans used to cover medical bills.

2. To obtain a loan from LendingClub, consumers first fill out an application and provide LendingClub with personal information such as the consumer's status as a customer of LendingClub, their loan amount, and the reason for the loan (*e.g.,* credit card consolidation) along with other personal information.

3. Unbeknownst to consumers, however, LendingClub integrated advertising web trackers from Microsoft and The Trade Desk that collect consumers' sensitive financial information while they fill out their loan applications—entirely without the consumer's knowledge and consent.

4. The problem with the trackers embedded on the LendingClub website is twofold: consumers are unaware of their presence, and they never consented to their usage. In fact, Plaintiff and the Class were *specifically assured by LendingClub that it would not share their personal data* with nonaffiliated third-party advertisers like Microsoft and The Trade Desk. The Microsoft and The Trade Desk trackers collect behavioral data such as Plaintiff's and the Class members'

---

[1] Press Release, LendingClub Corp., LENDINGCLUB CLOSES ACQUISITION OF RADIUS BANCORP (Feb. 1, 2021), https://www.prnewswire.com/news-releases/lendingclub-closes-acquisition-of-radius-bancorp-301218843.html ("It is the only full-spectrum fintech marketplace bank, and the first public U.S. neobank.").

activities on the LendingClub website including the fact that they are seeking a loan, the loan amount, and loan purpose. Having access to this level of granular data allows Microsoft, The Trade Desk and their customers to serve targeted advertisements to consumers based on information they provided on the Loan Application.

5. Plaintiff seeks to remedy these harms and bring causes of action for (1) violations of Cal. Penal Code §§ 631-632, *et seq*.; (2) violation of Cal. Penal Code §502; (3) violation of the Electronic Communications Privacy Act 18 U.S.C. § 2510, *et seq*.; (4) intrusion upon seclusion, and (5) negligence.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Class includes more than 100 members, and at least one member of the Class is a citizen of a State different from a Defendant. Plaintiff is a citizen of California; Defendant Microsoft Corporation is a citizen of the State of Washington. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, et seq. (the Electronic Communications Privacy Act).

7. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

8. This Court has personal jurisdiction over Defendants because they transact business in this District and because a substantial part of the conduct giving rise to Plaintiff's claims occurred in and emanated from California, where LendingClub maintains its principal place of business and operates its website, and where the Trackers intercepted the communications of Plaintiff and Class Members.

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including

at LendingClub's San Francisco headquarters, from which it operated its website and made the privacy representations at issue.

10. **Intradistrict Assignment:** Pursuant to Civil L.R. 3-2(c) and (d), this action is properly assigned to the San Francisco Division or the Oakland Division because a substantial part of the events giving rise to Plaintiff's claims arose in the County of San Francisco, where LendingClub maintains its principal place of business.

## THE PARTIES

11. Plaintiff Michelle Ann Mammini is a natural person and citizen of the State of California.

12. Defendant Happen, Inc., formerly known as LendingClub Corporation ("LendingClub"), is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 88 Kearny Street, Suite 600, San Francisco, California 94108. Effective June 22, 2026, LendingClub Corporation changed its corporate name to Happen, Inc. Because Defendant operated under the LendingClub name at the times relevant to the conduct alleged herein, this Complaint refers to Defendant as "LendingClub."

13. Defendant Microsoft Corporation is a corporation organized and existing under the laws of the State of Washington with its principal place of business located at 1 Microsoft Way, Redmond, Washington 98052. Microsoft conducts business in this District, including through its Bing search and advertising platforms, and has maintained offices in San Francisco, California.

14. Defendant The Trade Desk, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 42 North Chestnut Street, Ventura, California 93001. The Trade Desk conducts business in this District including at its offices located at 425 Market Street, Suite 2400, San Francisco, California 94105.

## FACTUAL ALLEGATIONS

### I. Brief Overview of the California Invasion of Privacy Act

15. The California Legislature enacted the California Invasion of Privacy Act ("CIPA") to protect the privacy rights of California citizens. In doing so, the California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

16. CIPA prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

17. To establish liability under CIPA, Plaintiff need only establish that Defendant does, or did, any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

18. Violations of CIPA are not limited to phone lines, but also apply to "new technologies" such as computers, the Internet, and email.[2]

19. CIPA § 632 further protects confidential communications such as financial communications at issue in this Complaint.

20. CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, without requiring proof of actual damages. Cal. Penal Code § 637.2(a)(1).

## II. Consumer's Financial Information Is Sensitive and Confidential

21. As a financial institution primarily engaged in lending, Defendant LendingClub is subject to federal obligations including those imposed by the Gramm-Leach-Bliley Act ("GLBA") and state statutes such as the California Financial Information Privacy Act ("CFIPA").

### *i. Defendant Failed to Comply with the GLBA*

22. Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

23. The GLBA defines a financial institution, as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

24. Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, Defendant was subject to the requirements of the GLBA, 15 U.S.C. §§ 6801, *et seq.*, and is subject to numerous rules and regulations promulgated under the GLBA.

---

[2] *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

25. Pursuant to the GLBA "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C.§ 6801(a).

26. These obligations apply to any information a consumer furnishes to a financial institution when applying for a loan or obtaining any other financial product or service. The GLBA defines, "nonpublic personal information" as "personally identifiable financial information." 16 C.F.R. § 313.3(n)(1). The GLBA further defines personally identifiable financial information as any information:

> (i) A consumer provides to you to obtain a financial product or service from you;
>
> (ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or
>
> (iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer. 16 C.F.R. § 313.3(o)(1).

27. The GLBA provides specific examples of what information constitutes "personally identifiable financial information" including:

> Information a ***consumer provides to you on an application to obtain a loan***, credit card, or other financial product or service;
>
> The fact that an ***individual is or has been one of your customers*** or has obtained a financial product or service from you;
>
> Any information about your consumer if it is disclosed in a manner that ***indicates that the individual is or has been your consumer***. 16 C.F.R. § 313.3(o)(2)(i)(A), (C)–(D) (emphasis added).

28. Indeed, the GLBA prohibits financial institutions—like Defendant—from disclosing nonpublic personal information to a nonaffiliated third party unless—

> (A) such financial institution ***clearly and conspicuously*** discloses to the consumer …that such information may be disclosed to such third party;
>
> (B) the consumer is given the opportunity***, before the time that such information is initially disclosed,*** to direct that such information not be disclosed

> to such third party; and
>
> (C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option. 15 U.S.C. § 6802(b)(1) (emphasis added).

***ii. Defendant Failed to Comply with CFIPA***

29. States also regulate the disclosure of consumers' financial information. The California Legislature enacted the California Financial Information Privacy Act because it found the "policies intended to protect financial privacy imposed by the Gramm-Leach-Bliley Act [to be] inadequate to meet the privacy concerns of California residents." Cal. Fin. Code § 4051.5(a)(3). The CFIPA intended to give Californians the ability to control the disclosure of their nonpublic personal information by "requiring that financial institutions that want to share information with third parties and unrelated companies seek and acquire the affirmative consent of California consumers prior to sharing the information." *Id.* § 4051.5(b)(2)

30. The CFIPA's author commented:

> [This law] will give consumers the final say in what happens to their personal financial information. The bill has been meticulously crafted and would be the strongest financial privacy bill in the nation, and will likely serve as a national model. ***It would generally require financial institutions such as banks, insurance companies and securities firms to get their customer's permission before they share a consumer's financial DNA with outside companies*** (opt-in)….Simply put, consumers should be the final arbiters of what happens to their personal financial information. And [this bill] will give them that right.

California Bill Analysis, S.B. 1 Assem., 8/18/2003 (emphasis added).

31. The obligations under the CFIPA are simple: "a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

32. The CFIPA has a strict opt-in requirement allowing financial institutions to share consumer financial information at the direction of the consumer and upon obtaining a "consent acknowledgment" from the consumer that meets specific statutory requirements. Cal. Fin. Code

§ 4053(a)(1). "A financial institution shall utilize a form, statement, or writing to obtain consent to disclose nonpublic personal information to nonaffiliated third parties…. The form, statement, or writing shall meet all of the following criteria:

> (A) The form, statement, or writing is a separate document, not attached to any other document.
>
> (B) The form, statement, or writing is dated and signed by the consumer.
>
> (C) The form, statement, or writing clearly and conspicuously discloses that by signing, the consumer is consenting to the disclosure to nonaffiliated third parties of nonpublic personal information pertaining to the consumer.
>
> (D) The form, statement, or writing clearly and conspicuously discloses (i) that the consent will remain in effect until revoked or modified by the consumer; (ii) that the consumer may revoke the consent at any time; and (iii) the procedure for the consumer to revoke consent.
>
> (E) The form, statement, or writing clearly and conspicuously informs the consumer that (i) the financial institution will maintain the document or a true and correct copy; (ii) the consumer is entitled to a copy of the document upon request; and (iii) the consumer may want to make a copy of the document for the consumer's records."

Cal. Fin. Code § 4053(a)(2).

## III. Overview of LendingClub

33. Defendant LendingClub is a financial institution that allows consumers to obtain personal loans. LendingClub will issue loans to consumers to pay off credit cards, consolidate debt, to refinance their auto loan, pay for a large expense, and even to pay medical bills—among others.

34. Effective June 22, 2026, LendingClub Corporation changed its corporate name to Happen, Inc. In the summer of 2026, it also rebranded its consumer-facing business as "Happen Bank" and began redirecting visitors from www.lendingclub.com to www.happen.com. Defendant operated under the LendingClub name when Plaintiff and Class Members submitted their Loan Applications, and its privacy policy continues to state that it does not share consumers' personal information with nonaffiliates to market to them.

35. According to LendingClub, "[a] personal loan allows you to borrow money from a lender for almost any purpose, typically with a fixed term, a fixed interest rate, and a regular

monthly payment schedule." LendingClub's loans allow consumers to borrow as much as $60,000 and receive funds in "as little as 24 hours."

36. LendingClub invites consumers to "check your rate" by first filling out a loan application. Consumers begin the loan application by indicating their desired loan amount and reason for the loan (the "Loan Application"). As shown in the example in **Figure 1,** the consumer is requesting a $30,000 loan to refinance their credit card debt.




*(**Figure 1,** showing the start of the Loan Application)*

37. Unbeknownst to the consumer, LendingClub embedded Trackers that collect the content of the consumer's loan application including their status as a customer of LendingClub, their loan amount, and the type of loans they are obtaining.

**IV. LendingClub integrated tracking software from Microsoft and The Trade Desk.**

38. LendingClub embedded invisible tracking software by Microsoft and The Trade Desk (the "Trackers") on its website which gather a vast assortment of personal information from consumers, including Plaintiff and the Class members.

39. When an individual accesses a webpage containing the Trackers, the Trackers instantaneously and surreptitiously duplicate communications with that webpage and send them to the third parties owning and operating their respective Tracker. The information travels directly

from both the user's browser and the webpage owner's server and then on to the servers operated by the Tracker.

40. The Trackers cannot be deleted from an individual's device; they are built into a webpage, and the consumer has no control, warning or knowledge of their presence or intrusive data collection. A consumer cannot prevent or even detect this transmission.

41. In this instance, LendingClub employed the Trackers to intercept, duplicate, and re-direct Plaintiff's and the Class members' sensitive financial information to Microsoft and The Trade Desk surreptitiously, and without the consumer's knowledge or consent. Specifically, when consumers navigate to webpages on LendingClub's website and input information in the loan application, the Trackers simultaneously intercepted the communication and transmitted it to their respective owners.

42. The Microsoft and Trade Desk Trackers each collect consumer loan information for their own purposes. That is, the Trackers collect financial data to fuel their advertising platforms allowing the Trackers to monetize the collected data and serve advertisements to consumers.

43. The Trackers operate on and within consumers' own devices. The Tracker code executes in the consumer's browser, on the consumer's computer or mobile device, and directs that device to transmit the contents of the consumer's communications to Microsoft's and The Trade Desk's servers. The Trackers also write data to consumers' devices: they place and read cookies and similar persistent identifiers—including the Microsoft MUID cookie, the cookies that the Microsoft Tracker stores under LendingClub's own domain (including the "_uetsid" and "_uetvid" cookies), and The Trade Desk's TDID and TDCPM cookies—in storage on the consumer's device, where they persist after the consumer leaves the LendingClub website. Because the Microsoft Tracker's "_uetsid" and "_uetvid" cookies are written in a "first-party" position under the website's own domain, common browser protections against third-party cookies do not block them. Similarly, the "cookie syncing" processes that Microsoft and The Trade Desk employ—reflected in the "cookie_sync" parameter transmitted to The Trade Desk

from LendingClub's website—are designed to link and propagate identifiers across domains and services notwithstanding browser settings intended to limit cross-site tracking.

44. In operating this way, the Trackers consume the resources of consumers' devices without permission. They occupy storage space with cookies and identifiers that consumers did not request and cannot readily detect; they cause consumers' devices and browsers to execute additional code and to initiate network transmissions that the consumer did not direct, consuming processing capacity, memory, bandwidth, and battery; and they impair the ordinary, intended operation of consumers' browsers and devices, including the basic expectation that a consumer's communications with a website will be delivered to that website alone.

**a. Microsoft Collects Loan Information from LendingClub Consumers**

45. LendingClub also integrated Microsoft's Bing tracker into its website (the "Microsoft Tracker"). Microsoft collects, in real time, Plaintiff's and the Class's interactions with the LendingClub website including the webpages the consumer visits and information provided in the Loan Application.

46. The purpose of the Microsoft Tracker is to drive advertising revenue. Microsoft touts that its Tracker is "a powerful Microsoft Advertising tool" that "records what customers do on your website then Microsoft Advertising starts collecting that data allowing you to track conversions (like purchases or leads) or target audiences using remarketing lists." [3]

47. Indeed, Microsoft also aggregates the data it has about consumers to personalize ads in general. Microsoft targets advertisements based on data it has collected about the consumer over time. Importantly, this includes information collected from websites like LendingClub and other sites where the Microsoft Tracker is present.

48. Microsoft collects Plaintiff's and the Class members' interactions with the LendingClub website, in real time. When consumers enter text and make selections in the Loan Application on LendingClub's website, the Microsoft Tracker collects the consumer's input. As

---

[3] Universal Event Tracking, MICROSOFT, https://learn.microsoft.com/en-us/advertising/guides/universal-event-tracking?view=bingads-13

shown in **<u>Figure 2,</u>** the Microsoft Tracker collects 1) the requested loan amount of **$30,000**, and 2) the loan purpose to consolidate **credit card** debt.

**Request**

Pretty Raw Hex

```
GET /action/0?ti=5318329&Ver=2&mid=226d9b9d-7ab9-43b7-838b-1608db270a2c&bo=2&
sid=4c1fe900b38111f081b9e157e51e37e3&vid=b484029097aa11f0a980cbf2ef527316&
vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=
Check%20Your%20Rate%20%7C%20LendingClub&p=
https%3A%2F%2Fwww.lendingclub.com%2Fapply%2Fpersonal%2Fidentity%2Fprimary-nam
e%3FloanAmount%3D30000%26loanPurpose%3Dcredit_card&r=
https%3A%2F%2Fwww.lendingclub.com%2Fpersonal-loan%2Fdebt-consolidation&lt=392
&evt=pageLoad&sv=2&asc=G&cdb=AQwR&rn=238127 HTTP/2
Host: bat.bing.com
Cookie: MUID=34991234A94460EE1111078DA83F61A8; MR=0
Sec-Ch-Ua-Platform: "macOS"
Accept-Language: en-US,en;q=0.9
Sec-Ch-Ua: "Chromium";v="141", "Not?A_Brand";v="8"
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
AppleWebKit/537.36 (KHTML, like Gecko) Chrome/141.0.0.0 Safari/537.36
Sec-Ch-Ua-Mobile: ?0
Accept: image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: image
Sec-Fetch-Storage-Access: active
Referer: https://www.lendingclub.com/
Accept-Encoding: gzip, deflate, br
Priority: i
```

*(**<u>Figure 2,</u>** screenshot showing that information from the Loan Application is intercepted and collected by the Microsoft Tracker.)*

49. Microsoft identifies each consumer using a "Microsoft User ID" or "MUID." A MUID is a persistent identifier that Microsoft describes as "Identif[ying] unique web browsers visiting Microsoft sites"[4] (the "Microsoft Identifiers").

50. The MUID identifies the consumer's device and allows Microsoft to track the consumer across various websites and domains. Even more concerning, Microsoft can access the MUID, which allows it to correlate a consumer's browsing history with a specific Microsoft user account. This occurs because Microsoft utilizes a process called "cookie syncing" that allows it

[4] Microsoft Privacy Statement, MICROSOFT, https://www.microsoft.com/en-us/privacy/privacystatement.

to synchronize the MUID across various services and domains such as bing.com, microsoft.com, live.com, among others.

51. Microsoft also collects various information about the consumer's devices such as their device's operating system and information about the consumer's web browser. For example, the Microsoft Tracker can determine that a consumer is using a Macintosh computer, the computer's operating system, and even the name of the browser, as shown in **Figure 2.**

**b. The Trade Desk Collects Loan Information from LendingClub Consumers**

52. The Trade Desk is a digital advertising platform that has declared itself "an objectively better way to advertise."[5] The way The Trade Desk ostensibly accomplishes this feat is by developing and deploying a tracker that collects consumer behavioral data, including but not limited to website activity, and by creating comprehensive consumer profiles based on the specific person's behaviors and interests (the "TTD Tracker").

53. The TTD Tracker operates like the Microsoft Tracker. The TTD Tracker collected consumers' interactions with LendingClub, including the webpages visited by the consumer, the exact text inputs they typed, and the selections they made during the Loan Application.

54. As shown in **Figure 3,** the TTD Tracker collected 1) the loan amount of "**$30,000**," and 2) the loan purpose of "**credit card"** debt consolidation from the consumer's selections in the Loan Application.

---

[5] THE TRADE DESK, https://www.thetradedesk.com.

**Request**

Pretty Raw Hex


```
GET /track/cei?advertiser_id=gxbic6q&cookie_sync=1&upv=3.0.0&upid=mg77oiy&paapi=1&
ref=
https://www.lendingclub.com/apply/personal/identity/primary-name?loanAmount=30000&
loanPurpose=credit_card HTTP/2
Host: insight.adsrvr.org
Cookie: TDID=8d895145-e911-45ab-824e-f2ba495bbce4; TDCPM=
CAESEgoDYWFtEgsIwLPz-a2OnD4QBRIWCgdydWJpY29uEgsI2qTDjufryj4QBRIVCgZnb29nbGUSCwjqi8
iS5-vKPhAFEhcKCGFwcG5leHVzEgsIgoj3k-fryj4QBRIUCgV0YXBhZBILCP7h69b7hq4-EAUSFgoHYWRk
dGhpcxILCOiZsuLPqJI-EAUSFQoGY2FzYWxlEgsI_Iyenefryj4QBRIYCgliaWRzd2l0Y2gSCwjEo4qj5-
vKPhAFEhcKCHB1Ym1hdGljEgsIxv6Ko-fryj4QBRIYCglhZGFkdmlzb3ISCwj46t7vzqiSPhAFEhYKB2xo
d2JrNTkSCwiakYGm7KiSPhAFEhYKB3lqbjBndXASCwjMzbuBhOaZPhAFEhYKB3N2eDl0NTASCwjAkL-vk-
aZPhAFEhYKB2V4ZWxhdGUSCwi247nhhOaZPhAFEhYKBzZzemhpdGoSCwiyvffTwqH4PRAFEhYKB3gyZTd0
cTgSCwiQ8ffTwqH4PRAFEhYKBzBhaWM0aWoSCwjOqbjhhOaZPhAFEhYKBzRoM3luMWYSCwj6-LyBhOaZPh
AFEhkKCmxpdmVpbnRlbnQSCwiAsYax8LWsPhAFEhsKDHNoYXJldGhyb3VnaBILCNje2Ij4hq4-EAUSFgoH
YXpoZTI2ZxILCPzX2aDtofg9EAUSFgoHdmN4bHprehILCN64vq-T5pk-EAUSFgoHc2VtYXNpbxILCNqMi8
rtqJI-EAUSFgoHZDB0cm8xahILCLCx-7ivovg9EAUSFgoHMWkwNzFuYxILCMLm_OntqJI-EAUSFgoHdWVk
M2t2chILCNLvv6-T5pk-EAUSGAoJbW9va2llLXBzEgsI-Ma5ne6okj4QBRIXCghsaXZlcmFtcBILCLiq_9
6E5pk-EAUSFgoHaWx2MDM3eRILCMaIueGE5pk-EAUYBTgBQgQiAggB
Sec-Ch-Ua: "Chromium";v="141", "Not?A_Brand";v="8"
Sec-Ch-Ua-Mobile: ?0
Sec-Ch-Ua-Platform: "macOS"
Accept-Language: en-US,en;q=0.9
Upgrade-Insecure-Requests: 1
User-Agent: Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36
(KHTML, like Gecko) Chrome/141.0.0.0 Safari/537.36
Accept:
text/html,application/xhtml+xml,application/xml;q=0.9,image/avif,image/webp,image/
apng,*/*;q=0.8,application/signed-exchange;v=b3;q=0.7
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: navigate
Sec-Fetch-Dest: iframe
Sec-Fetch-Storage-Access: active
Referer: https://www.lendingclub.com/
Accept-Encoding: gzip, deflate, br
Priority: u=0, i
```


*(**<u>Figure 3,</u>** showing information from the Loan Application being collected by the TTD Tracker.)*

55. Consumers, including Plaintiff, solely intended to communicate with LendingClub when they made their selections and typed text during the Loan Application. However, the moment the consumer navigated to a webpage or input text or made a selection on the Loan Application, the TTD Tracker simultaneously intercepted and collected the consumer's activity in real time.

56. The Trade Desk identifies each consumer interaction by using persistent identifying cookies such as The Trade Desk ID ("TDID") and The Trade Desk Cookie Partner

Mapping ("TDCPM") cookies (the "Trade Desk Identifiers"). Indeed, The Trade Desk admits that its cookies enable its "ability to distinguish between, recognize, and store data about unique web browsers and devices" and allow it to "record information about them over time."[6]

57. The Trade Desk also creates profiles on consumers derived from their behavioral data such as their activity on the LendingClub website including the fact that they are seeking a loan, the loan amount, and loan purpose. Having access to this level of granular data allows The Trade Desk and its advertisers to serve targeted advertisements to consumers based on information they provided on the Loan Application.

**V. Consumers Never Provided Their Consent**

58. The problem with the Trackers is twofold: consumers are unaware of their presence, and they never consented to their usage. In fact, consumers including Plaintiff and the Class were *specifically assured by LendingClub that it would not share their personal data* with third party advertisers exactly like Microsoft and The Trade Desk.

59. Plaintiff and the Class did not and could not consent to the use and collection of the personal information by the Trackers. Not only were consumers never made aware of the Trackers' presence and the manner in which they operate, the Trackers and LendingClub never sought nor obtained consent from Plaintiff and the Class to intercept, collect, or disclose the contents of their Loan Applications.

60. LendingClub's privacy policy outlines the reasons it can share consumer's personal information. LendingClub very clearly states "No" and "we don't share" "your personal information" "for nonaffiliates to market to you." See **Figure 4**.

---

[6] The Trade Desk Services Privacy Policy, THE TRADE DESK, https://www.thetradedesk.com/us/privacy.

| Reasons we can share your personal information | Does LendingClub share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes -** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes -** to offer our products and services to you | Yes | No |
| **For joint marketing with other financial companies** | Yes | Yes |
| **For our affiliates' everyday business purposes -** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes -** information about your creditworthiness | Yes | Yes |
| **For our affiliates to market to you** | Yes | Yes |
| **For nonaffiliates to market to you** | No | We don't share |

*(**Figure 4,** showing LendingClub's promise not to share consumer's personal information with nonaffiliates for marketing purposes.)*

61. To be clear, LendingClub defines "nonaffiliates" as "companies not related by common ownership or control." LendingClub lists several entities such as LendingClub Bank, National Association, Consumer Loan Underlying Bond (CLUB) Depositor LLC, LendingClub Corporation, and LC Boost, Inc. as "affiliates." The Trackers like Microsoft and The Trade Desk are obviously nonaffiliates as they are not related by common ownership and control to LendingClub and are not specifically enumerated as affiliates of LendingClub.

62. By embedding the Trackers on its website, including on webpages containing the Loan Application, LendingClub allowed and enabled the Trackers to collect Plaintiff's and the Class member's personal information for the *sole purpose of marketing to them* in direct contradiction to its promise to consumers.

63. LendingClub's privacy policy elsewhere discloses that LendingClub "participate[s] in interest-based advertising and use[s] third-party advertising companies to serve you targeted advertisements based on your browsing history," and that it may permit third-party advertising networks to collect information about "your use of our websites over time." That disclosure speaks to browsing history, not private data communicated as part of a Loan Application.

64. Nothing in LendingClub's privacy policy discloses—much less obtains consent for—the interception and disclosure of the contents of the Loan Application itself, including the

requested loan amount and loan purpose, which constitute nonpublic "personally identifiable financial information" that LendingClub was obligated to keep confidential and that LendingClub expressly promised not to share with nonaffiliates for marketing purposes. No reasonable consumer would understand that disclosure to permit the conduct alleged herein.

## FACTS SPECIFIC TO PLAINTIFF

65. Plaintiff Michelle Ann Mammini is domiciled in California. In or around September 2024, while located in California, Plaintiff visited www.lendingclub.com and completed a Loan Application. To obtain the loan, Plaintiff provided LendingClub with the amount she sought to borrow and the reasons she was seeking it.

66. Plaintiff is concerned about her privacy. At all relevant times, LendingClub's privacy policy assured consumers that LendingClub does not share their personal information with nonaffiliates to market to them. After she submitted the application, LendingClub emailed her links to its privacy policy, which assured her that her personal information would not be shared with nonaffiliated parties for marketing purposes.

67. Unbeknownst to Plaintiff, LendingClub embedded Microsoft and The Trade Desk Trackers on its website. The Trackers intercepted her form entries—including, but not limited to, her requested loan amount and loan purpose—as she entered them. The Trackers then correlated those entries with a profile through cookies and other persistent identifiers.

68. Worse, on information and belief, the data the Trackers collected from Plaintiff's form submissions was used to deliver targeted advertising. After she submitted her loan application, Plaintiff began receiving targeted online advertisements for loans and other financial services. She also began receiving promotional mailings and telephone solicitations for personal loans. She had not received such solicitations before applying.

69. Plaintiff was not aware and had no reason to know that the Trackers were embedded on the LendingClub website and did not consent to the Trackers collecting any of her financial information. Quite the contrary—LendingClub assured Plaintiff that her personal information would not be shared with nonaffiliated third parties for marketing purposes.

70. Plaintiff did not learn—and could not reasonably have learned—that the contents of her Loan Application had been intercepted by and disclosed to third parties until May 2026. The Trackers left no visible trace on LendingClub's website, and nothing in LendingClub's communications with Plaintiff disclosed their existence.

**TOLLING, CONCEALMENT, AND ESTOPPEL**

71. The applicable statutes of limitations have been tolled by LendingClub's knowing and active concealment of the facts alleged herein.

72. LendingClub repeatedly represented to consumers that it would not share their personal information with nonaffiliated third parties for marketing purposes, and assured Plaintiff and Class Members that the information they provided in the Loan Application would remain confidential.

73. LendingClub never disclosed that it would disregard those representations and instead embed the Trackers that enable Microsoft and The Trade Desk to intercept communications containing consumers' personally identifiable financial information. LendingClub affirmatively concealed its true conduct and made representations that were misleading as to the nature and operation of the Trackers. The presence of invisible third-party trackers on the LendingClub website would lead reasonable users to believe that no third party was collecting their information and that LendingClub was not facilitating any such disclosure.

74. Plaintiff and Class Members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

75. Because the Trackers operated invisibly and their presence was concealed, LendingClub was under a duty to disclose the true nature of its conduct to Plaintiff and Class Members. LendingClub is therefore estopped from relying on any statute of limitations.

76. The applicable statutes of limitations have also been tolled by operation of the discovery rule. Plaintiff and Class Members could not, through the exercise of reasonable diligence, have discovered LendingClub's conduct as alleged herein.

77. Accordingly, Plaintiff and the Class could not have reasonably discovered the truth about Defendants' practices until shortly before this action was commenced.

## CLASS ACTION ALLEGATIONS

78. **Class Definition:** Plaintiff brings this action on behalf of herself and other similarly situated individuals defined as follows:

> **Nationwide Class:** All persons in the United States who completed a loan application on the LendingClub website during the period in which the Trackers were embedded on it (the "Class Period").
>
> **California Class:** All persons in the state of California who completed a loan application on the LendingClub website during the Class Period.

79. Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

80. Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

81. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records.

82. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff used LendingClub's website and had her personal information disclosed to third parties without her express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

83. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and

not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

84. Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether Defendants intentionally tapped the lines of internet communications;

(b) Whether the Trackers surreptitiously intercept communications;

(c) Whether LendingClub enabled the Trackers to intercept communications;

(d) Whether the Trackers read or learned the contents of Plaintiff's and Class Members' communications while those communications were in transit;

(e) Whether the Trackers are a third-party eavesdropper;

(f) Whether Defendants' actions constitute an intrusion upon Plaintiff's and the Class's seclusion; and

(g) Whether Defendants obtained consent from Plaintiff and the Class.

85. Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

86. Application of California Law to the Nationwide Class. California substantive law applies to the common law claims of Plaintiff and the Nationwide Class. LendingClub maintains its principal place of business in San Francisco, California, where it made the decisions to select, configure, and embed the Trackers on its website and where it drafted and disseminated the privacy policy containing the representations at issue. The Trade Desk maintains its principal place of business in Ventura, California. The interception, collection, use, and disclosure of Plaintiff's and Class Members' communications alleged herein emanated from, and were effectuated through, LendingClub's website, which is operated from California. California has a strong interest in regulating the conduct of businesses headquartered within its borders and in ensuring that companies operating from California honor the privacy obligations imposed by California and federal law, and no other state has a greater interest in the application of its law to the claims alleged herein. Application of California law to the claims of the Nationwide Class is therefore appropriate and consistent with due process.

**FIRST CAUSE OF ACTION**
**Violation Of the California Invasion of Privacy Act,**
**Cal. Penal Code §§ 631-632, *et seq.***
**(On Behalf of Plaintiff and the California Class, Against All Defendants)**

87. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the proposed Class.

88. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

> The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

89. California Penal Code § 631(a) provides, in pertinent part (emphasis added):

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

90. Under CIPA, Defendants must show they had the consent of all parties to a communication.

91. At all relevant times, LendingClub aided, employed, agreed with, and conspired with third parties, including Microsoft and The Trade Desk to track and intercept Plaintiff's and Class Members' internet communications. These communications were transmitted to and intercepted by a third party during the communication and without the knowledge, authorization, or consent of Plaintiff and Class Members.

92. Microsoft and The Trade Desk each violated Section 631(a) by willfully, and without the consent of all parties to the communication, reading or attempting to read or learn the contents of Plaintiff's and Class Members' communications with LendingClub while those communications were in transit, and by using the information so obtained for their own advertising, profiling, and commercial purposes.

93. LendingClub intentionally inserted an electronic listening device onto Plaintiff's and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications to Microsoft and The Trade Desk and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

94. LendingClub willingly facilitated the interception and collection of Plaintiff's and Class Members' sensitive financial information by embedding the Trackers on its website and webpages containing the Loan Application.

95. The Trackers are completely invisible to website users, and LendingClub has full control over these tools, including where they are embedded, what information is tracked and transmitted, and how events are categorized prior to their transmission.

96. The Trackers constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

97. Defendants failed to disclose their use of the Trackers to specifically track and automatically and simultaneously transmit Plaintiff's and Class Members' communications to Microsoft, The Trade Desk, and other undisclosed third-parties.

98. The Trackers are designed to transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the user's communications are intercepted in transit to the intended recipient—LendingClub.

99. LendingClub violated CIPA by aiding and permitting third parties to intercept and receive its consumers' online communications in real time as they were made. Importantly, Microsoft, The Trade Desk, and other unauthorized third parties would not have intercepted or received the contents of these communications but for LendingClub's actions, including its decision to install the Trackers on its website and webpages containing the Loan Application.

100. By disclosing Plaintiff's and Class Members' sensitive financial information, LendingClub violated Plaintiff's and Class Members' statutorily protected right to privacy.

101. Furthermore, the communications intercepted by the Trackers are confidential communications within the meaning of CIPA § 632**.** The contents of the Loan Application, including the fact of the consumer's loan inquiry, the requested loan amount, and the stated loan purpose, constitute "nonpublic personal information" and "personally identifiable financial information" that LendingClub is obligated to keep confidential under the Gramm-Leach-Bliley Act, 15 U.S.C.§ 6801(a), and the California Financial Information Privacy Act, Cal. Fin. Code §

4052.5. Because federal and California law impose affirmative duties of confidentiality on financial institutions with respect to precisely this category of information, and because LendingClub expressly represented that it would not share such information with nonaffiliates, Plaintiffs and Class Members had an objectively reasonable expectation that their Loan Application communications were not being recorded or intercepted by, or transmitted to, any third party. As such, Defendants violated CIPA § 632.

102. As a result of the above violations, and pursuant to CIPA Section 637.2, Defendants are liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2(c) specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

103. Under the statute, Defendants are also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendants in the future.

**SECOND CAUSE OF ACTION**
**Violation of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA")**
**Cal. Penal Code § 502, *et seq.***
**(On Behalf of Plaintiff and the California Class, Against All Defendants)**

104. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

105. Cal. Penal Code § 502(j) provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

106. Section 502(c)(2) imposes liability on any person who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network." The web browsers, computing devices, and mobile devices of Plaintiff and California Class Members each constitute a "computer," "computer system," or "computer network" within the meaning of the statute.

107. Microsoft and The Trade Desk knowingly accessed the web browsers and devices of Plaintiff and California Class Members, and took, copied, and made use of data from those devices—including the contents of the Loan Application and the persistent identifiers used to associate that data with consumer profiles—by causing the Trackers embedded on the LendingClub website to execute on those devices and to transmit that data to the third parties' servers.

108. This access was "without permission." Plaintiff and California Class Members did not consent to the Trackers' access to their devices or to the taking, copying, or use of their data. To the contrary, LendingClub represented that it would not share their personal information with nonaffiliated third parties for advertising purposes, and the Trackers operated covertly, without disclosure, circumventing the privacy protections and expectations that LendingClub's representations created. The third parties' access and use exceeded any authorization and defeated the technical and contractual restrictions that governed the permitted use of Plaintiff's and California Class Members' data.

109. LendingClub is liable for these violations because it knowingly aided, abetted, and induced the third parties' unauthorized access and use, including by deciding to install the Trackers, configuring them, and embedding them on the webpages containing the Loan Application. LendingClub also violated Section 502(c)(6) by knowingly and without permission providing or assisting in providing a means of accessing Plaintiff's and California Class Members' computers, computer systems, and computer networks, and Section 502(c)(7) by knowingly and without permission causing those computers, computer systems, and computer networks to be accessed.

110. Defendants also violated Section 502(c)(1), which imposes liability on any person who knowingly accesses and without permission alters or otherwise uses any data, computer, computer system, or computer network in order to wrongfully control or obtain money, property, or data, and Section 502(c)(8), which imposes liability on any person who knowingly introduces a computer contaminant into a computer, computer system, or computer network. The Trackers are "computer contaminant[s]" within the meaning of Cal. Penal Code § 502(b)(12) because they are sets of computer instructions that are designed to record and transmit information within a consumer's computer without the intent or permission of the owner of that information. Defendants introduced the Trackers onto Plaintiff's and California Class Members' devices, where they usurped the normal operation of those devices by recording Plaintiff's and California Class Members' communications and transmitting them to third parties, by writing persistent identifiers into device storage, and by consuming device resources—all without permission.

111. Plaintiff and California Class Members suffered damage and loss by reason of these violations in ways that include, without limitation: (a) expenditures of time and resources reasonably and necessarily incurred to investigate and verify what data was taken from their devices, whether their computers, systems, and data were altered or compromised by the unauthorized access, and how to limit further unauthorized collection; (b) the unauthorized consumption of their devices' storage, memory, processing capacity, bandwidth, and battery by Tracker code, cookies, and transmissions they did not request; (c) the impairment of the intended operation of their browsers, devices, and privacy controls; (d) the diminution in value of their personally identifiable financial information; (e) the loss of the ability to control, withhold, or receive compensation for that information; and (f) the deprivation of the full value of the services Plaintiff and California Class Members obtained from LendingClub, which included LendingClub's promises of confidentiality.

112. Personally identifiable financial information of the kind the Trackers took has real and quantifiable market value. A market exists in which companies pay consumers for their browsing, search, and transactional data: Microsoft itself compensates consumers for their search

activity through its Microsoft Rewards program, and technology companies have operated panels that paid consumers for access to their browsing data. The Trade Desk likewise operates a data marketplace through which advertisers pay for access to consumer audience data, and data reflecting a consumer's active, present intent to obtain a loan—such as the contents of the Loan Application—is among the categories of consumer data most valuable to advertisers. Defendants' unauthorized taking and use of Plaintiff's and California Class Members' financial information deprived them of the ability to withhold, control, or be compensated for that information and diminished its value to them, while Defendants profited from that same information without paying for it.

113. Plaintiff and California Class Members suffered damages and loss as a result of Defendants' conduct. Defendants unjustly profited from Plaintiff's and California Class Members' personally identifiable financial information and online activity, and it would be inequitable to permit Defendants to retain the profits they earned by violating Plaintiff's and California Class Members' privacy interests. Plaintiff and California Class Members retain a cognizable interest in those unjustly earned profits. Plaintiff and California Class Members were damaged by, among other things, not receiving any share of the profits Defendants generated from the use of their data.

114. Pursuant to Cal. Penal Code § 502(e), Plaintiff and California Class Members are entitled to compensatory damages, disgorgement of Defendants' unjustly earned profits, injunctive and other equitable relief, and reasonable attorneys' fees. Because Defendants' violations were willful, Plaintiff and California Class Members are also entitled to punitive damages under Cal. Penal Code § 502(e)(4).

**<u>THIRD CAUSE OF ACTION</u>**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq*.**
**(On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

115. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

116. The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

117. In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

118. The ECPA protects both sending and receipt of communications.

119. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

120. The transmissions of Plaintiff's sensitive financial information to LendingClub qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

121. **Electronic Communications**. The transmission of sensitive financial information between Plaintiff and Class Members and LendingClub are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [any] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

122. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

123. **Interception.** The ECPA defines "intercept" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

124. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) Plaintiff's and Class Members' browsers;

(b) Plaintiff's and Class Members' computing devices and mobile devices;

(c) LendingClub's web-servers; and

(d) The Trackers deployed by LendingClub to effectuate the sending and acquisition of communications.

125. LendingClub did not merely permit or procure the interception of Plaintiff's and Class Member's communications. LendingClub itself intercepted those communications. LendingClub selected, customized, configured, and deployed the Trackers; it embedded their code on the webpages containing the Loan Application; and it determined what data the Trackers would capture and to which third parties that data would be routed. By these affirmative acts, LendingClub played an active role in the interception of Plaintiff's and Class Members' communications, such that the interception was carried out by LendingClub and not solely by Microsoft or The Trade Desk. LendingClub is therefore directly liable as an intercepting party under 18 U.S.C. § 2511(1)(a).

126. The Trackers operated as LendingClub's own instruments. They ran as code embedded in and served from LendingClub's webpages; they executed automatically whenever a consumer communicated with those pages, and they functioned according to configurations that LendingClub selected as the holder of the Microsoft Advertising and The Trade Desk advertiser accounts associated with the tags on its website. Through the Trackers, LendingClub acquired the

contents of Plaintiff's and Class Members' communications as those communications were made and simultaneously caused duplicate transmissions of those contents to be routed to Microsoft and The Trade Desk. LendingClub thereby intercepted, and endeavored to intercept, Plaintiff's and Class Members' electronic communications. Its liability under the ECPA is direct; Plaintiff does not proceed against any Defendant on this Count on a theory of aiding, abetting, or other secondary liability.

127. The contents of the intercepted communications were also returned to LendingClub. Microsoft's and The Trade Desk's advertising platforms are designed to—and, on information and belief, did—report back to their advertiser customers, including LendingClub, event-level and audience-level information derived from the intercepted communications, including conversion tracking, audience segments, and campaign analytics. LendingClub used the contents of the intercepted communications, directly and through those advertising tools, to track conversions, to build remarketing audiences of loan applicants, to measure and optimize its advertising, and to target consumers—including Plaintiff—with advertisements, knowing or having reason to know that the information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(1), in violation of 18 U.S.C. § 2511(1)(d). LendingClub's intentional disclosure and redirection of those contents to Microsoft, The Trade Desk, and their advertising systems likewise violated 18 U.S.C. § 2511(1)(c).

128. When Plaintiff and Class Members interacted with LendingClub's website and the webpages containing the Loan Application, LendingClub, through the Trackers embedded and operating on its website, contemporaneously and intentionally disclosed, used, and redirected, and endeavored to disclose, use, and redirect, the contents of Plaintiff's and Class Members' electronic communications to third parties, including Microsoft and The Trade Desk without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c)-(d).

129. The communications intercepted by LendingClub, Microsoft, and The Trade Desk include, but are not limited to, the contents of communications to and from Plaintiff and Class

Members regarding their Loan Applications. As such, Defendants violated 18 U.S.C. § 2511(1)(a).

130. Furthermore, by intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to Microsoft and The Trade Desk while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), LendingClub violated 18 U.S.C. § 2511(1)(c)-(d).

131. LendingClub intentionally used the wire or electronic communications to increase its profit margins, and it specifically used the Trackers to track and utilize Plaintiff's and Class Members' financial information for its own financial gain.

132. Defendants Microsoft and The Trade Desk used the wire or electronic communications for their own purposes: to increase their profit margins and to serve consumers advertisements based on the behavioral information they collected.

133. Defendants were not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

134. Plaintiff and Class Members did not authorize Defendants to acquire the content(s) of their communications for any purpose whatsoever.

135. Any purported consent Defendants received from Plaintiff and Class Members was not valid.

136. **Unauthorized Purpose**. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing criminal or tortious acts independent of, and beyond, the act of interception itself, as well as in contradiction to the representations that it will not share personal information with nonaffiliates for advertising purposes. At the time of the interception, each Defendant intended not merely to acquire the Loan Application communications, but to use and disclose those communications thereafter—by incorporating their contents into persistent consumer profiles, monetizing them, and deploying them to target advertising—in a manner that itself constituted a further invasion of

privacy and a violation of the financial privacy obligations required by the laws of the United States and California. The independent criminal and tortious acts include, inter alia, violations of the confidentiality obligations imposed by the GLBA, 15 U.S.C. § 6802, and the CFIPA, Cal. Fin. Code § 4052.5, the breach of LendingClub's express promises not to share consumers' personal information with nonaffiliates for marketing purposes, and the common law intrusion upon Plaintiff's and Class Members' seclusion alleged herein. The commission of those independent criminal and tortious acts was the primary motivation for, or at a minimum a determining factor in, each Defendant's interceptions, and that purpose existed at the time of each interception.

137. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

138. LendingClub is a "party to the communication" with respect to Plaintiff's and Class Members' communications, but its simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' communications does not qualify for the party exemption.

139. More specifically, LendingClub's acquisition of Plaintiff's and Class Members' communications, which were used and disclosed to unauthorized third parties, was done for the purpose of committing criminal and tortious acts in violation of the laws of the United States and California.

140. As such, Defendants cannot viably claim any exception to ECPA liability.

141. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendants' violations of the ECPA.

142. As a result of Defendants' violation of the ECPA, Plaintiff and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## FOURTH CAUSE OF ACTION

**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Nationwide Class, Against All Defendants)**

143. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

144. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with LendingClub. Indeed, LendingClub made specific representations to Plaintiff and the Class that they will not share their personal information with nonaffiliated third parties for purposes of advertising.

145. Plaintiff and Class Members communicated sensitive and protected financial information and individually identifiable information that they intended for only LendingClub to receive and which they understood LendingClub would keep private.

146. LendingClub's disclosure of the substance and nature of Plaintiff's and Class Members' communications to third parties without their knowledge and consent, and Microsoft's and The Trade Desk's surreptitious interception and collection of those communications, are intentional intrusions on Plaintiff's and Class Members' solitude or seclusion.

147. Plaintiff and Class Members had a reasonable expectation that their communications and financial information and other data would remain confidential, and that LendingClub would not install wiretaps to secretly transmit their communications to unauthorized third parties.

148. A reasonable person would find Defendants' surreptitious interception, collection, and disclosure of their sensitive financial information highly offensive.

149. As such, LendingClub obtained Plaintiff's and Class Members' personal information under false pretenses and/or exceeded its authority.

150. As a result of Defendants' actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

151. Plaintiff and Class Members have also suffered economic injury. Their personally identifiable financial information has independent, ascertainable monetary value, and a market

exists in which such information is bought, sold, and licensed. Defendants Microsoft and The Trade Desk profited from the unauthorized acquisition and exploitation of that information—by enriching their consumer profiles, by monetizing the data through their advertising platforms, and by selling or facilitating the sale of targeted advertising derived from it—and LendingClub profited by obtaining advertising and analytics services keyed to that same information. Defendants did so without compensating Plaintiff or Class Members and without their consent.

152. Plaintiff and Class Members retain a legally cognizable interest in the profits Defendants unjustly earned from the misappropriation of their financial information. That interest exists regardless of whether Plaintiff and Class Members intended to sell their own data and regardless of whether the data was rendered less valuable to them. Plaintiff and Class Members are therefore entitled to disgorgement of the profits Defendants unjustly derived from their personally identifiable financial information, and this stake in unjustly earned profits constitutes a concrete injury.

153. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

154. Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests.

155. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendants' actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

156. Plaintiff also seeks such other relief as the Court may deem just and proper.

**<u>FIFTH CAUSE OF ACTION</u>**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class, Against Defendant LendingClub)**

157. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

158. As a financial institution that solicited and received Plaintiff's and Class Members' nonpublic personal financial information, LendingClub owed Plaintiff and Class Members a duty to keep that information confidential and to safeguard it. That duty is established by, among other sources, the standards of care embodied in the Gramm-Leach-Bliley Act and the California Financial Information Privacy Act, and by LendingClub's own express representations that it would not share such information with nonaffiliated third parties. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on LendingClub's website.

159. Contrary to its duties and its express promises of confidentiality, LendingClub installed the Trackers to disclose and transmit to third parties Plaintiff's and Class Members' communications with LendingClub.

160. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged. In fact, they were made contrary to LendingClub's express representations.

161. The third-party recipients included, but may not be limited to, Microsoft and The Trade Desk.

162. As a direct and proximate result of LendingClub's unauthorized disclosures of consumer personally identifiable, non-public financial information, and communications, Plaintiff and Class members were damaged in that:

- Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;
- Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;
- LendingClub eroded the essential confidential nature of the relationship;

- General damages for invasion of their rights in an amount to be determined by a jury;
- Nominal damages for each independent violation;
- LendingClub took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;
- Plaintiff and Class Members did not get the full value of the services for which they paid, which included LendingClub's duty to maintain confidentiality;
- LendingClub's actions diminished the value of Plaintiff's and Class Members' sensitive financial information; and
- LendingClub's actions violated the property rights Plaintiff and Class Members have in their sensitive financial information.

**RELIEF REQUESTED**

Plaintiff, on behalf of herself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

(b) A declaratory judgment that Defendants violated: (1) the California Invasion of Privacy Act; (2) the California Comprehensive Computer Data Access and Fraud Act; (3) the Electronic Communications Privacy Act; (4) Plaintiff's and Class Members' privacy rights as provided at common law; and (5) that LendingClub's conduct constitutes negligence.

(c) An order enjoining Defendants from engaging in the unlawful practices and illegal acts described herein; and

(d) An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable

attorneys' fees and expenses and costs of suit; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Date: August 26, 2026

Respectfully submitted,

**MILBERG PLLC**
/s/ William J. Edelman
William J. Edelman (SBN 285177)
Heather M. Lopez (SBN 354022)
280 South Beverly Drive, Penthouse
Beverly Hills, CA 90212
Telephone: 866.252.0878
wedelman@milberg.com
hlopez@milberg.com

Albert J. Plawinski (*pro hac vice forthcoming*)
**PLAWINSKI, PLLC**
2101 Pearl Street
Boulder, Colorado 80302
Telephone: (303) 720-7095
Email: albert@plawinski.law

*Counsel for Plaintiff and the Proposed Class*